# WHEELING.

## STATE *v.* MORGAN.

Submitted June 11, 1891.—Decided June 20, 1891.

1. CRIMINAL PROCEEDINGS—VERDICT.
    The record shows that Jeremiah S. Peirpoint is one of the jury sworn in the case, and the verdict is signed by J. S. Peirpoint. This will not affect the verdict.

2. CRIMINAL PROCEEDINGS—REVERSAL OF JUDGMENT—SEPARATION OF WITNESSES.
    An order to separate witnesses during a trial should always be granted, unless there be very strong reasons against it, which can rarely exist; but it is not so far matter of right as to call for the reversal of a judgment, where it has been refused, unless it affirmatively appear that the party suffered injury from its refusal.

3. CRIMINAL PROCEEDINGS—EVIDENCE.
    An exclamation by a person at night, while in bed, not addressed to any one, is offered against her on trial for murder, and

objected to, because made in sleep. · It does not appear whether
the person was asleep or awake. It was properly allowed to go
to the jury.

4. CRIMINAL PROCEEDINGS—EVIDENCE.
   To exclude a confession, it must not only be made under in-
   ducements of favor or fear, but such inducement must come
   from one in authority.

5. CRIMINAL PROCEEDINGS—INSTRUCTIONS.
   Motive in the commission of a crime is a material element for a
   jury in considering it, but it is not indispensable that it should
   be apparent, to sustain a conviction. An instruction telling a
   jury that, if they find no motive on the part of the prisoner
   existed for the commission of the crime, that itself is sufficient
   to raise a reasonable doubt of guilt, is bad.

6. CRIMINAL PROCEEDINGS—INSTRUCTIONS.
   An instruction should not single out one fact or element of the
   case, and make the case turn entirely on it, by telling the jury to
   find according to the hypothesis of that fact or element, ignor-
   ing all other material facts or elements.

7. CRIMINAL PROCEEDINGS—WITNESSES.
   The State is not bound to call all the witnesses present at the
   commission of the offence, nor a person so present who appears
   to be the only one present save the prisoner. It is the province
   of the prosecuting officer, not the court, to determine who shall
   be examined as witnesses for the State.

8. CRIMINAL PROCEEDINGS—INDICTMENT.
   Upon an indictment in the form prescribed by section 1, c. 144,
   Code 1887, for murder, the State may prove any manner of kill-
   ing or different manners of killing.

9. CRIMINAL PROCEEDINGS—NEW TRIAL—APPELLATE COURT.
   Discussion of principles on an application in an appellate court
   to set aside a verdict on the ground that the evidence is not
   sufficient to warrant it.

*R. S. Blair & Son* for plaintiff in error, cited 26 W. Va.
379; 2 W. Va. 581; 29 Cal. 622; 27 Ga. 287; 30 Mo. 286;
8 Car. & P. 297; 14 Ga. 55; 2 Halst. 220; 1 Bis. Crim.
Pro. (2nd Ed.) § 1087; Elihu Gregg *v.* State, 3 W. Va.
705; Apoc. His. Susanna, verses 51-2; Whar. Crim. Ev.
(9th Ed.) §§ 635, 675; 19 Cal. 40; 39 N. Y. 39; 73 Mo.
695; 10 Gratt. 734-37, 742; 83 Ala. 1; 54 Ala. 241; 68
Ala. 569; Chit. Crim. Law 572; 18 Am. Dec. 404; 20 Am.
Dec. 401; 22 Am. Dec. 454; 36 Am. Dec. 557; 34 Am.
Dec. 672; 61 Am. Dec. 793; 32 Gratt. 914; 8 C. & P. 609;

Crim. Evidence 136; Whar. Crim. Ev. (9th Ed.) § 448 and bottom notes §§ 749-50; 91 Pa. St. 493; 1 N. Y. Crim. Rep. 180, 283; 55 Ia. 517; Wills Cir. Ev. 34-35; 22 W. Va. 776; 25 W. Va. 227; Whar. Crim. Ev. (9th Ed.) 380, 698.

*Attorney-General Alfred Caldwell* for the State, cited 1 Greenl. Ev. (Redf. Ed.) § 432 note and cases cited; 1 Thomp. Tr. 252-259; 25 Ill. 136; 66 Ala. 244; 2 Best Ev. 636; 6 Gratt. 584; 32 Gratt. 946; Code (1887) c. 156, s. 13; 3 W. Va. 705; 111 Ind. 515; 95 Mo. 68; 98 Ind. 59; 3 Ut. 133; 69 Ga. 404; 67 Ga. 739; 4 Lea (Tenn.) 428; Code (Ky.) § 601; 82 Ky. 84; 89 N. C. 42; 13 Tex. App. 244; 10 Gratt. 742; 14 Gratt; 659; 24 Gratt. 643; 30 Gratt. 833; 27 Gratt. 980; 33 Gratt. 845; 2 Whar. Crim. Law § 227 *et seq;* 2 Hawk P. C. c. 29, s. 16; 20 W. Va. 679; 26 W. Va. 117.

Brannon, Judge:

On the 15th day of September, 1890, in the Circuit Court of Tyler county, Mary Jane Morgan was sentenced to the penitentiary during her natural life for the murder of her husband, Jacob Morgan; and she has come to this Court praying relief from her sentence.

The first ground assigned for the reversal of the sentence is, that the verdict finding the prisoner guilty is signed by J. S. Peirpoint, whereas the list of jurors sworn in the case does not show any juror of that name, and thus an unsworn juror tried the prisoner.

The record does show in the panel a juror named "Jeremiah S. Peirpoint." Clearly, we ought to say that this juror, Jeremiah S. Peirpoint, wrote only the initials of his Christian name, as is very common, and that the juror sworn on the panel and the one signing the verdict are one and the same. Are we to say that while the jury was in custody of the sheriff, and kept together and secured, one of them escaped, and another man was substituted, or that another man got into the case? We think not, especially when an explanation of the apparent discrepancy so readily presents itself. *Younger's Case,*

2 W. Va. 581, does not compel us to such an unreasonable decision, which would bring the administration of criminal justice into ridicule; for there the juror signing the verdict was P. B. Shively, while the sworn panel showed no such name, the nearest approach to it being P. B. Smith.

The second ground on which we are asked to reverse the sentence is, that the court refused to separate the witnesses on the prisoner's motion.

1 Bish. Crim. Proc. §§ 1188, 1189, lays down the law on the subject thus: "Justice will some times be promoted and seldom hindered by causing witnesses to be examined apart from one another. Therefore, almost as of course, yet not as of strict right or necessarily, the court on motion of either party, will direct the retirement of witnesses to a separate room, to return and testify, one by one, as called. * * * The making or refusing of the order, and the form of it when made, are alike within the discretion of the presiding judge, not generally subject to revision by a higher tribunal."

Whart. Crim. Pl. § 569, states the law thus: "It is within the power of the court to order that the witnesses should be excluded from the court-room. At the same time, the action of the court trying the case will not be revised in this respect in error, unless it appear that manifest injustice has been done."

In 1 Thomp. Trials, §§ 275, 276, it is said that in civil and criminal trials it is a rule of practice for the judge on motion of either party to direct that the witnesses shall be examined out of the hearing of each other, and such an order is rarely withheld, but that "by the weight of authority the party does not seem entitled to it as a matter of right." In section 276, Thompson says: "According to a much prevailing view, whether the court will thus sequester witnesses, or, as it is sometimes called, 'put them under the rule,' is a matter of some judicial discretion, which discretion will not be revised on error or appeal, in the absence of an appearance of abuse."

1 Greenl. Ev. § 432, states that the order of separation "is rarely withheld; but, by the weight of authority, the party does not seem entitled to it as a matter of right."

Old English authorities cited by Greenleaf hold that the matter is one of discretion, not of strict right.

From these great text-writers, and an examination of many of the authorities which they cite, I conclude that the separation of witnesses ought, on the motion of either party, to be granted in the interest of the discovery of truth and the detection and exposure of falsehood, unless strong reason be shown against it, which rarely occurs; but that it is not strictly matter of right, so that its refusal shall be ground for reversal in the absence of the appearance of prejudice to the party. If the order were a matter of right and not of discretion, then from its refusal the law would infer prejudice to the party; but, if not being a matter of right, it must in some way affirmatively appear that the party was in fact injured. It does not so appear in this case. Why this order, almost universally accorded, especially in grave criminal trials, was in this case refused, does not appear; but it does not appear that it worked harm to the prisoner. The cases are numerous which hold that a witness remaining in court in violation of an order of separation may nevertheless be examined, his conduct bearing only on his credit, and subjecting him to proceedings for contempt. *Hopper* v. *Com.*, 6 Gratt. 684; *Hey's Case*, 32 Gratt. 946, and citations; *Gregg's Case*, 3 W. Va. 705.

The Case of Gregg, just cited, is urged upon us as ground for reversal. The syllabus there states that "it is the duty of the courts to separate witnesses, either in civil or criminal cases, if asked by either party."

The constitution did not then, as now, require that the syllabus should be prepared by the court. The language is that of Judge MAXWELL in delivering the opinion, and is not at all objectionable, as a general statement of the duty of the trial-court; but Judge MAXWELL did not mean to say that the non-observance of that duty would reverse a judgment; and, if he did, the expression is *obiter dictum*, because the question did not arise in the case; for in that case the court did make an order of separation, but, a witness having remained in the room, the question was whether he could be examined.

Baron ALDERSON once said that it was the right of either party to require such separation ; but, as the author of Thompson on Trials (section 277) says, "this was very different from holding that a judgment would be reversed because the trial-court had refused to grant such an application." Not a single case or text-writer has been cited as squarely holding that a refusal to separate the witnesses is ground for reversal.

The third ground assigned for the reversal of the sentence is the admission in evidence of a certain ejaculation or exclamation of the prisoner, which it is claimed is not admissible, because made by the prisoner in sleep.

Lottie Callahan, the prisoner, and a little girl were sleeping together in one bed, the little girl in the middle, and in the room were two other beds occupied by others ; and about twelve or one o'clock at night Lottie Callahan heard the prisoner exclaim : "They have deviled me so much about this that I don't care how it goes ; I only consented to his death, and gave him the poison."

One case (*People* v. *Robinson*, 19 Cal. 40) has been cited holding it error to admit declarations or talk of a defendant while in sleep, the court holding that if he was in sleep the inference is that he was not conscious of what he was saying. In the present case it does not appear whether or not the prisoner was asleep when this exclamation escaped from her, the witness saying that she could not say whether she was asleep or awake. A question occurs to my mind whether it was incumbent on the State to show that the prisoner was not asleep as a condition precedent to the introduction of the exclamation, in analogy to the law that it is a condition precedent to the admissibility of a confession that it be voluntary, and that the burden of showing it to be voluntary is upon the State, and that before admitting it the court must find it to be voluntary (*Thompson's Case* 20 Gratt. 724) ; but we conclude that the action of the court, in laying it before the jury, to have such weight as they thought proper to accord to it, was proper. It was a question of fact, which the jury was competent to decide, whether the prisoner was awake or asleep when the ejaculation was made. We must assume that it was discussed before

the jury in lights applicable to the subject, to enable the jury to make an intelligent estimate of its weight. It was with them to say whether it was made in sleep and was therefore worthless, or whether, though in sleep, it was but the divulgence of truth, springing from guilt which rested heavy on the soul and broke forth through voice and lips, the half conscious man revealing secrets indelibly impressed on the memory, which, if fully awake, he would fain have suppressed. It was with the jury to say whether she was fully awake, and forgot herself, and in this soliloquy spoke out the truth. The operation of the human mind is an enigma, and its expressions in the unconsciousness of sleep are frequently vagaries and fictions, but sometimes born of reality.

In this connection there is a somewhat notable coincidence. It is beyond question that Jacob Morgan died of a shot entering his back, passing through liver and lungs, and coming out in the breast, a deep stab in the side, and a cut or cuts on his throat severing his jugular vein, and cutting out the root of his tongue, and not at all from poison. The prisoner in this midnight exclamation said : " I only consented to his death, and gave him the poison." When the neighbors, after dark, went into the murdered man's house in answer to the alarm which the prisoner had given, she having, as she said, left her husband struggling with two murderers, who were shooting and cutting him to death, and run to give alarm, they found the supper table spread ; and on the table was a tea-cup with tea and bread in it, and she, returning to the house with these neighbors, at once took this tea-cup and threw its contents out, saying that the murderers might have put poison in it. She told a witness that when her husband returned from town that evening she had supper ready, but he declined eating, saying he had had supper, but that she urged him to take a cup of tea with her. Had she designed and prepared his murder by poison, and, this failing, resorted to other means ? There is something of mysterious import in this matter. If there was poison in the cup, who put it there ? Not the unknown strangers. It would tell strongly the murderous intent. It is urged in argument that, the State having re-

lied on death by other means than poison, this ejaculation was not admissible, because it tended to prove death by poison; but a theory of the State, prominent in the case, was that the prisoner was a party to a plot and conspiracy with paramours or others to murder her husband, and that that part of this exclamation which makes her say, "I only consented to his death," corroborates and sustains that theory; and therefore, if the exclamation be at all admissible, that part of it would meet and answer the point of objection to it justed stated. It does not appear that when this exclamation was made the prisoner was asleep, and, if that fact would exclude it, for its want we can not hold that it was error to place it before the jury.

The fourth ground assigned for the reversal of the sentence is that the court refused to exclude confessional statements of the prisoner made to Christa Craig.

It is clearly true that it was under the promise of Craig, who stated to her that he had discovered circumstances strongly implicating her, that he would favor her, and suppress the evidence which he claimed to have, that she made these statements; and clearly, if Craig had been a person in authority, the evidence would be rejected. But Craig was only a detective, ferreting out the crime, who interviewed the prisoner in jail. Though perhaps admitted to the jail by the jailer, he was not a person in authority. The only reason suggested for deeming him a person in authority is that presumably he was admitted to the jail by the jailer, and that the statements were made under his apparent sanction. It is so well settled that, to exclude confessions, they must be made, not only under inducements, but under inducements held out by persons in authority, that I shall not discuss the subject, but simply refer to *Smith's Case*, 10 Gratt. 734; *Shifflet's Case*, 14 Gratt. 659; *Thompson's Case*, 20 Gratt. 724; *Venable's Case*, 24 Gratt. 643; *Page's Case*, 27 Gratt. 980; *Mitchell's Case*, 33 Gratt. 845.

The fifth objection to the sentence is that the court refused the prisoner's instructions Nos. 5, 6, 7, 8, 9, 12, 13, 14 and 15, and substituted and gave one numbered 26 in lieu of No. 13. No. 5 is as follows: "The jury is instructed that,

if they find from the evidence in this cause that no motive existed in the mind of the defendant to commit the crime wherewith she is charged in the indictment, that is sufficient, within itself, to be taken into their consideration, upon which to predicate a reasonable doubt."

This instruction is bad, because it tells the jury that, if no motive was apparent to commit the crime, that is itself sufficient to inspire a reasonable doubt, in effect, to acquit; for, if there be reasonable doubt, acquittal must follow. It would have been, perhaps, proper to tell the jury to take into consideration a want of motive, along with other features of the case, for that is an item in the process of weighing evidence and reaching a conclusion; but this instruction singles out that single fact, and forgets all other facts in the case, and tells the jury, in effect, to acquit, and invades the right of the jury to weigh all the evidence. Want of apparent motive is not all-controlling in a trial, as this instruction would make it. It may be true that crime is never committed without a motive, but that motive may be beyond the reach of evidence or even conjecture, and therefore proof of motive is not indispensable to conviction. 1 Bish. Crim. Proc. § 1107. *Dean's Case,* 32 Gratt. 912, by no means asserts that, to warrant a conviction upon circumstantial evidence, time, place, motive, means, and conduct must each and all concur in pointing out the prisoner as the guilty agent, and that, if one of those elements be wanting, there can be no conviction. It only says that, when all these elements do concur, a strong case is made against him.

No. 6 is as follows: "The jury is instructed that, before the defendant can be convicted as an accessory before the fact, they must be satisfied from the evidence beyond a reasonable doubt that the defendant was not only present at the time, but also they must be satisfied from the evidence beyond a reasonable doubt that she was aiding and abetting the perpetrator." This instruction was irrelevant, as the prisoner was not indicted as an accessory, but as principal. Also, though based on the theory of an accessory before the fact, it supposes evidence which does not suit that theory, but would make the party a principal. Besides, it can not be harmonized with No. 7 in its legal proposition.

No. 7 is as follows : " The jury is instructed that an accessory before the fact is one who, being absent at the time the felony was committed, does yet procure, counsel, or command another to commit a felony, and words amounting to bare permission will not alone constitute this offence, nor concealment of a design to commit it." As the prisoner was not indicted as an accessory, what relation to the case has this instruction ? If it was intended to tell the jury that, as the prisoner was indicted as a principal, she could not be convicted if the evidence showed her to be an accessory, it was irrelevant, for, if guilty, she was a principal, and there was no evidence tending to show that she was only an accessory. It may be questionable whether the words "bare permission" reflect the law, or, at least, whether a permission on the part of the wife to the murder of a husband would not make her participation sufficiently active as an encouragement to the actors to make her an accessory. .

Hawkins' Pleas of the Crown, cited by Mayo's Guide as authority for this language "bare permission," may not sustain it, as it says (volume 29, sec. 16) : "As to the second point, viz., in what case a man shall be adjudged an accessory before, it seems to be agreed that those who by hire, command, counsel, or conspiracy, and it seems to be generally holden that those who, by showing an express liking, approbation, or *assent to another's felonious design of committing a felony*, abet and encourage him to commit it, but are so far absent when he actually commits it that he could not be encouraged by the hopes of any immediate help or assistance from them, are all of them accessories before the fact, both to the felony intended, and to all other felonies which shall happen in and by the execution of it, if they do not expressly retract and countermand their encouragement before it is actually committed." The italics are mine. But I do not deem it necessary to pursue this feature of instruction 7. Instructions 6 and 7 are not urged in the brief of prisoner's counsel.

No. 8 is as follows : " The jury is instructed that, if they believe from the evidence in this cause that Clarissa Morgan was present, and saw the act committed with which this defendant is charged, it is incumbent upon the State to

have produced the said Clarissa Morgan as a witness (if she be living under the jurisdiction and within reach of the process of this Court) in behalf of the State, and it can not substitute circumstantial evidence in lieu of positive evidence.' No. 9 is as follows: "The jury is instructed that it devolves upon the State to produce, if it is in her power, in all criminal cases of this kind, the very best evidence that can be obtained. Therefore, if the jury believe from the evidence in this cause that the crime wherewith the defendant is charged was committed openly and not secretly, and in the presence of Clarissa Morgan, who is now living and within the jurisdiction of the court and subject to its process, it was the duty of the State to have procured her upon trial, and its failure to do so raises the presumption of law that, if she had been so produced, her evidence would have been adverse to the State, and that that in itself is sufficient to raise a rational doubt as to the guilt of the defendant; therefore you must acquit."

I shall not discuss the principles involved in these two instructions, because this Court in *Cain's Case*, 20 W. Va. 679, elaborately discussed them, and held that it is not the duty of the State to examine all the witnesses present at the commission of an offence, and that it is the province of the prosecuting officer, and not the court, to determine who shall be examined for the State. The fact that the State fails to call a witness present at the fact may be considered by the jury, but it is not a ground of error. This child, Clarissa Morgan, is the granddaughter of the prisoner, and was of tender years, and raised by the prisoner. We do not know, even, that she knew the obligation of an oath, or was at all competent, if the law were that the State was bound to call her. Evidence in the case tends to show that on one occasion, after the murder, the child said she wanted to go to her Uncle Bas. Morris's house, and said she was afraid to stay with her grandmother, and her grandmother called her a "dirty little thing;" and the child persisted in going, and said, "I am going to tell;" and her grandmother said, "Tell what?" and added, "I'll cut your throat, if you tell that." Under these circumstances, it is not surprising that the State exercised its right of not calling her as a witness. The prisoner could have called her.

No. 12 is as follows: " The jury is instructed that if they believe from the evidence in this cause, beyond any reasonable doubt, that the decedent came to his death by poison, then no conviction can be had under this indictment, and it will be your duty to acquit." This instruction is not insisted upon in the brief, and does not propound the law correctly, for, the indictment being the general form prescribed by Code 1887, c. 144, s. 1, which does not specify any mode of killing, any mode or manner of killing may be proven under it.

No. 13 is as follows : " The jury is instructed that extrajudicial confessions should be received with great caution. Therefore, if you believe from the evidence in this cause that the confessions claimed to have been made by the defendant are inconsistent, improbable, incredible, contradictory, or discredited by other evidence, or were the emanations of a weak or excited state of mind, the jury may exercise their discretion in rejecting them, either wholly or in part; and, if you have any reasonable doubt as to the probability, consistency, or credibility of such confessions, or that they emanated from an unexcited mind, then it is your duty to acquit."

This instruction is bad. It makes the case of the State rest solely on the prisoner's confession, telling the jury that, if they find the confession to be circumstanced as set forth in it, they should disregard it, and acquit the prisoner, thus ignoring all other evidence in the case criminating the prisoner, and there was a very considerable quantity of it, and thus withdrawing every other feature of the case from the jury ; thus making the court say that, in its opinion, if the confession of the prisoner were so circumstanced, the balance of the evidence was inadequate to sustain a conviction, and so making the court usurp the province of the jury. And the theory that, if the confession emanate from an excited mind, it should be disregarded, is untenable. That was a matter to be weighed by the jury. The fact that parties were under fear and excitement did not exclude their confessions in *Smith's Case*, 10 Gratt. 734, and *Venable's Case*, 24 Gratt. 639. Speaking for myself, while the circumstances of inconsistency, improbability *etc.*, sup-

posed in the instruction, were entirely proper to be considered by the jury in weighing the confession, and the court might properly have told the jury that it should consider those circumstances, yet it could not, as proposed by this instruction, invade the province of the jury, and tell them absolutely that, if the confession were so circumstanced, they must throw it away. In short, the instruction infringed upon the province of the jury, and was very properly refused. The court in lieu of the last instruction (13) gave an instruction, No. 26, as follows, and we think there is no error in substituting it for No. 13, and that it was fair to the prisoner, and all she could ask on the subject of which it treated. · Instruction No. 26: "The jury are instructed that, in considering extra-judicial confessions, they have the right to take into consideration the circumstances under which they were made, the credibility of the witness or witnesses by whom they are detained, the condition and circumstances of the party alleged to have made them, the probability or improbability of such confessions, and that you have the right to consider the same in connection with all the evidence in the case; that you are the sole judges of the credibility of all the witnesses and the weight of the evidence, and you may give to the evidence of the witnesses just such weight as you think it entitled to under the circumstances of the case."

The prisoner complains of the refusal of instruction No. 14, which is as follows: "The jury is instructed that, if they believe from the evidence in this cause that the confessions detailed by C. Craig, as having been made to him by defendant, were extorted from her by false representations of apparently strong and incontrovertible evidence of guilt which he claimed to have in his possession, then such confessions should be received by you with extreme caution, and you may reject or receive them either in whole or in part." I think it trenched upon the jury's right to weigh and consider the confession without any discontinuing of its effect by the court as a legal proposition. As to these instructions, in effect, telling the jury how to treat the confession. I would apply the language used by Judge JOHNSON in *State* v. *Betsall*, 11 W. Va., on page 740, that

"in Virginia and this State, the juries are the judges of the law as well as the fact in a criminal case; and while the court may charge the jury as to the law of the case, yet the court is not permitted to charge the jury as to the weight of the evidence. Our courts are somewhat peculiar in this respect; but the law has been so held in Virginia from the earliest history of its jurisprudence, and we we think it constitutes one of the brightest ornaments thereof."

In *Ross* v. *Gill*, 1 Wash. (Va.) 88, Pres. PENDLETON said: "If the question depends on the weight of the testimony, the jury, not the court, are exclusively and uncontrollably the judge." See Hurst's Case, 11 W. Va. 75. In Betsall's Case, while the practice stated in all the books justified, nay, made it the duty of, the judge to advise the jury not to convict on the uncorroborated testimony of an accomplice, and that its omission is error (1 Greenl. Ev. § 380) it was there held that a verdict might rest solely on his testimony, and that "in this state it is not proper for the court to give any instructions to the jury as to the weight of such or any other evidence." And besides, I think that instruction 26, given in lieu of 13, was all that the prisoner was entitled to on the matters contained in No. 14 as well as 13.

Instruction No. 15 refused the prisoner is as follows: "The jury is instructed that, if they believe from the evidence in this cause that a conspiracy was formed by the defendant and others associated with her for the purpose of murdering Jacob Morgan, the decedent named in the indictment in this prosecution, then no conviction can be had of the defendant under this indictment." It is plainly bad. Why could she not be convicted under this indictment, though she had entered into a conspiracy? If the instruction had said that if she had entered into such a conspiracy, but was not present aiding and abetting at the murder, it would have been proper. The theory of the State was, and it gave evidence tending to show, that the prisoner had confederated with others to murder her husband, and was present aiding and encouraging the bloody and atrocious deed; and she admitted to different

persons, at different times, she was present, and there was no evidence of her absence; and the instruction was improper and irrevelant.

The court gave the following instruction, on the State's motion : "If the jury believe from the evidence, beyond any reasonable doubt, that a conspiracy was formed between the prisoner, Mary Jane Morgan, and other persons, whose names are unknown, that the purpose of that conspiracy was to murder Jacob Morgan, and that, pursuant to that conspiracy, the unknown members of the conspiracy, or some of them, killed Jacob Morgan, and that the killing was done with malice aforethought, either expressed or implied, and that the prisoner, Mary Jane Morgan, was present at the time Jacob Morgan was killed, and aided by acts, or encouraged by words or gestures, those actually engaged in said killing, then said prisoner was a principal in the killing and murder." It does not seem to be assigned as error, but it is urged in the brief of prisoner's counsel as error, because it is said that, while it states the law correctly, there was no evidence tending to prove such a conspiracy, and that the prisoner aided in the murder.

Christa Craig stated, in effect, that the prisoner, on being told that he had evidence implicating her, asked him how he got it; that he showed her some statements implicating her, when she again asked how he got the information, and asked Craig if he could not help her, when he told her that he could, on condition that she would tell him if there was not a plot to murder Morgan, and she admitted there had been, and that it was formed on a Sunday, not on a Wednesday, and she promised to tell him who was in the plot, but did not, though requested by him several times to do so after she had been released from jail; that he asked her what was the inducement to kill Morgan, and she said she cared nothing for him; that he did not please her any too well; that there were other men she could enjoy herself with. Craig also stated that he asked her what they did with the blood on the floor, and she said she had scrubbed it up. He also stated that he told her that on the night of the murder he was about the house for a bad purpose, at a certain time and place, and told her the number

of times she had come out of the house, and she exclaimed, "My God, you know it." She gave Craig her note for one hundred dollars for his services and favor. There was evidence that she was anxious to have her husband convey her his farm; that she said if Morgan were dead she would draw a pension, and asked whether she would, and was informed that she would; that she was discontented, and lived unhappily with her husband; and said she had been "haggared to death," and would rather die than live in that way; and that she would have things carried to her own notion. On one occasion, when mad, she said she would be God damned if she was going to live there another year longer. She said she did not think hard of the men that murdered him, and that he was better off. She told several shortly before the murder that she had a dream that two or three men had come there to murder her husband, and said she knew he would be murdered. On one occasion, when the conversation was about her husband's going west when he should receive his pension, she said that it would do him no good, for some one would kill him for his money; and, some one saying that he reckoned not, she said, "You will see." After his murder she still talked of this dream, saying that she knew he would be killed from that dream; that "she dreamed it was done, and her dream turned out just the same men she saw in her dream." She uniformly and frequently stated that, while she and her husband were at supper after dark, an unknown man came to the house, and asked supper for three, and then the man shot her husband in the breast, and they engaged in a scuffle around the room, and her husband, though she did not lift a finger to help him, was getting the better of this man, when another man appeared on the scene and commenced cutting the throat of her husband, whereupon she fled. The room was found in order, the table set, giving no evidence of a scuffle. The physicians who made the *post mortem* examinatian say that the deadly shot through liver and lungs would have instantly paralyzed Morgan so that he could not scuffle, tending to show the utter improbability of any such scuffle as she narrated. She told that he was shot in the breast, while it is certain it was in the back. In one of his

garments was found $3.29, in another $11. The prisoner had on her person $110 of his money after the murder, which she asked a party to conceal. If strangers murdered him for money, it is strange that they left any money. There was evidence tending to show that a skirt of the prisoner's, found hidden in a barrel of feathers in the loft, and thence moved and hidden under the hearth, had blood on it.

This short statement is enough, I think, to show that there was evidence tending to show such conspiracy, that she was a party to it, and that she was present at the murder, encouraging it, if not committing it alone and unaided, so as to render the instruction asked by the state relevant. The evidence in the record is very detailed and voluminous showing many more circumstances bearing on this instruction and on the general phase of the case than I have given.

The sixth and last ground relied upon for reversing the sentence is that the evidence did not warrant the verdict. I shall not detail the evidence under this head. As no two cases are alike in facts, such detail would be no precedent for future cases, and is not necessary for the purposes of our decision. I have stated under other heads only a fraction of the many facts and circumstances appearing in the many pages of the evidence. Enough has been indicated, however, to show that there was some evidence—a great deal of evidence—tending to sustain the verdict. In the first place, as to the motion for a new trial, I remark that the record certifies, not the facts, but the evidence, and therefore we are to apply the well-established rule, acted on in *Flanagan's Case,* 26 W. Va. 116, and *Baker's Case,* 33 W. Va. 319 (10 S. E. Rep. 639) that, in such case, this Court will not reverse the judgment unless, after rejecting all the conflicting parol evidence of the exceptor, and giving full faith and credit to that of the adverse party, the decision of the trial-court still appears to be wrong. Assault is made in argument on the credit of witnesses Callahan and Craig, but, under the rule just stated, they are to be given credit. The evidence of Craig is very material in this case, the case turning largely, but by no means entirely,

upon it. A jury are uncontrollably the judges of the credit of witnesses, and, where a case turns solely or materially on the credit of witnesses, a new trial will not be granted by this Court. *Patteson* v. *Ford*, 2 Gratt. 19 ; *Proctor* v. *Spratley*, 78 Va. 254. A misconception of the functions of this Court, as to setting aside a verdict, seems to prevail quite widely. It seems to be considered that this Court can take the place, not only of a circuit judge, but also that of a jury, and enter upon the process of weighing evidence, and, if it should think the evidence short, or such as, had its members been of the jury, they would not have found, then the verdict should be set aside. This is by no means the function of this Court. This would be for this Court to usurp the province not only of the trial-judge, but that of the jury, who are peculiarly the triers of fact under our system. The circuit judge and the jury see and hear the witnesses, their words, their demeanor, their countenances, the true and actual features of the case, while we see only the evidence on paper, and are at this distance much less competent to weigh evidence. Why have a jury and circuit judge, thirteen in number, if their verdicts are to be reversed by four appellate judges, because they happen to think their decision erroneous on the evidence?

In *Lawrence's Case*, 30 Gratt. 845, the judges said they would have acquitted the prisoner if they had been on the jury, or granted a new trial had they presided at the trial, but as an appellate court they could not do so. Same principle in *McCune's Case*, 2 Rob. (Va.) 771 ; *Sheff* v. *Huntingtan*, 16 W. Va. 307.

I am aware that cases in Virginia and this State are to be found granting new trials where there was evidence tending to sustain the verdict, but the appellate court undertook to weigh the evidence, and grant new trials, with perhaps doubtful propriety, and seemingly not in harmony with the principles they themselves laid down. The principles on which an appellate court will act in this matter have been stated in differing language, on different occasions, and the exact rule is somewhat hard to define.

In *Hill's Case*, 2 Gratt. 594, and *Grayson's Case*, 6 Gratt. 712, it is said that it is only where a verdict is "plainly

against the evidence, or without sufficient evidence;" so in *Smith's Case*, 24 W. Va. 815; but different men, under this rule, would differ.

In *Miller* v. *Insurance Co.*, 12 W. Va. 116, and *Sheff* v. *Huntington*, 16 W. Va. 308, it is said a new trial should be granted "only in a case of plain deviation from right and justice, not in a doubtful case, merely because the court, if on the jury, would have given a different verdict;" that the verdict "ought not to be interfered with * * * unless manifest wrong and injustice have been done, or unless the verdict is plainly not warranted by the evidence or facts." Other cases phrase it in different language.

A criminal case in a Circuit Court, and in this Court on an overruled motion for a new trial, occupies a vastly different place. I might almost say that in the Circuit Court the question is whether the prisoner is guilty beyond a reasonable doubt, whereas, after a verdict of guilt and its approval by the Circuit Court, the situation is reversed, and the question here is whether it appears that he is innocent. I think that an appellate court enters on dangerous ground when it assumes the role of a jury, and enters upon the process of accurately weighing evidence. I think that, when there is some evidence to sustain a verdict, it is dangerous to overthrow it. It seems to me that, where the question is whether there is sufficient evidence to sustain a verdict, the language used in several cases, so far as language can express a general rule aptly, reflects the true principle, and that is that "where some evidence has been given which tends to prove the facts in issue, or the evidence consists of circumstances and presumptions, a new trial will not be granted" by an appellate court. *Grayson's Case*, 6 Gratt. 712; *Sheff* v. *Huntington*, 16 W. Va. 307; *Miller* v. *Insurance Co.*, 12 W. Va. 116.

I strongly approve the aptness and force of Judge SNYDER'S language in *Cooper's Case*, 26 W. Va. 338: "In Virginia and this State the courts have always guarded with jealous care the province of a jury. If the question depends on the weight of testimony, or inferences and deductions from facts proved, the jury, not the court, are exclusively and uncontrollably the judges. This conclusion

.is based upon the well-established rule that the jury are the sole judges of the evidence, the credibility of all admissible testimony, and the inferences from the facts and circumstances proved."

In *Betsall's Case*, on p. 743 of 11 W. Va., Judge JOHNSON said that, where a jury has found a party guilty in a criminal case, and a new trial is asked on the ground that the evidence is insufficient to sustain the verdict, the appellate court will not grant a new trial, unless it is "irresistibly clear that the conviction was wrong."

We can not say that it is thus clear that the verdict in this case is wrong; indeed, grave and solemn as is this verdict, we do not see that it is unjust. It seems to me, after reading all the evidence, that time, place, motive, and conduct point to the accused as the guilty agent in this horrible murder, and this circumstance, under *Dean's Case*, 32 Gratt. 912, makes a strong case against her. It is a most solemn duty, that of confirming a sentence condemning a woman to the penitentiary as long as life shall last. Let us hope that no mistake has been committed. It is a terrible crime of which the prisoner has been convicted, the murder of a husband, and the deed was done in so cruel and revolting a manner as to make us shudder. If guilty, the prisoner meets a well-deserved punishment; and her conviction is but another of the many instances to show that the law, "Thou shalt do no murder," is yet as vital and instinct with life, as when it was delivered by the great Law-Giver, and follows the guilty one ' with unerring eye and unfaltering step. The judgment is affirmed.

LUCAS, P., and ENGLISH, J., concur.

HOLT, J., (*dissenting*) is of opinion that the record shows a case in which the prisoner's motion to separate the witnesses should have been granted; and that as the motion was not granted, the judgment of the court below should be reversed and the cause remanded for a new trial.

AFFIRMED.