STATE OF IOWA v. CHARLES ROCKER, Appellant.

**Murder:** *Corpus delicti:* DEATH BY STRANGULATION: EVIDENCE.
1  On a prosecution for murder the evidence is reviewed and held sufficient to establish the *corpus delicti* independent of defendant's confession; that the death was not suicidal but felonious; and that defendant accomplished the crime by strangulation, aided therein by the administration of chloroform.

**Juries:** CHALLENGE FOR CAUSE BY STATE: PREJUDICE.  Conscientious
2  scruples against infliction of the death penalty is not a ground

of challenge for cause by the State, but where jurors were excused for that reason and prior to completion of the jury the court discovered its error, ordered the names returned to the box and that another jury be called, no prejudice arose of which defendant could complain from the action of the court in reconsidering its ruling.

**Argument:** PREJUDICIAL STATEMENTS OF COUNSEL. Although reference by counsel to a statement of defendant relating to his conduct toward deceased, which is claimed by a defendant accused of murder to have been made in his sleep, is not admissible; still, when there is nothing in the record aside from the nature of the statement to apprise the court whether defendant claimed to have been asleep when making the statement, it was not error to allow the statement of counsel to stand.

**Murder:** EVIDENCE OF DETAILS OF CRIME. Where the evidence tended to show the administration of chloroform in connection with the killing of deceased, it was competent to show the purchase of chloroform by defendant just prior thereto, under an indictment charging death from strangulation at the hands of defendant; since the evidence simply tended to explain the details of the crime and not to prove that it was committed otherwise than as alleged.

**Same.** Proof that defendant was lighter in weight than deceased does not negative the fact that he could not have hung the body up; especially as there was nothing in the record to show the length of the rope from the neck to the fastening above, or that the body swung clear.

**Rebuttal evidence:** THEORY OF CRIME: EVIDENCE IN SUPPORT OF. Evidence of the condition and appearance of one dying from strangulation is competent, in rebuttal of the inference to be drawn from the suspended position of the body when found, that death had resulted from hanging; and where the State's evidence tended to show that deceased was first disabled by chloroform and then strangled by defendant, evidence of the effect of chloroform was admissible to sustain that theory.

*Appeal from Osceola District Court.*— HON. F. R. GAYNOR, Judge.

TUESDAY, JUNE 9, 1908.

THE defendant was convicted of murder in the first degree, and appeals.— *Affirmed.*

*E. C. Roach* and *R. M. Hunter,* for appellant.

*H. W. Byers,* Attorney General, and *Chas. W. Lyon,* Assistant Attorney General, for the State.

LADD, C. J.— Another jury has convicted the accused of having caused the death of August Schroeder by strangulation, and the case is here for review a second time. See *State v. Rocker,* 130 Iowa, 239.

The main contention is that the evidence is insufficient to sustain the verdict. The defendant was deceased's hired man, assisting on his farm, and in the afternoon of June 29, 1900, went with him to an Old Settlers' picnic at Doon, about four miles distant. They started for home at about midnight, and upon arrival defendant went directly to his room upstairs, while the wife of deceased helped her husband put out the horse, after which they entered the kitchen and ate a lunch. He drank coffee and some whisky, and expressed himself as not feeling well, whereupon she removed his shoes and also his outside shirt, and, after sitting a little while, they retired, she undressing, but he lying on the bed with his trousers on. This was shortly after three o'clock in the morning, and, upon awakening shortly before daylight, the wife discovered that her husband had gone. She immediately rose, and, after looking about the house, discovered him in the alley or space in front of the horses in the barn with a rope about his neck, hanging to a joist above. His eyes and mouth were closed, and his arms hanging down. The joist was two inches by six inches; the lower part being seven feet above the floor. She ran to the house for a knife, and, calling defendant without response, went back to the barn, cut the rope, and then hastened to deceased's brother's home, about one hundred rods distant. The brother and his wife returned with her, arriving before the sun was up, and found the body on the barn floor where it had fallen when

*Margin note:* 1. MURDER: *corpus delicti:* death by strangulation: evidence:

the rope had been cut. His features were in repose, the eyes and mouth closed, his hands open, and his body warm and limp. The rope had left a dark or bluish-red mark about his neck just below "Adam's apple," and there was a mark on each side of his neck at the windpipe near the jaw. These were about an inch apart; the right one being larger than the left and the latter being the longer. These were not as dark as the mark made by the rope, were lighter in color near the center, and several witnesses testified that they looked like finger-marks, one fitting his fingers in them. There were also marks on his back, four or five inches long and three or four inches wide, on either side of the spine. He had on an undershirt, trousers, and stockings only. The stockings were clean, though the barn was one hundred feet from the house and the intervening space bare.

A physician, who examined the body at six o'clock, testified that the marks next to the jaws, if inflicted in life, might have caused death by strangulation, and in his opinion they were produced during life, as were also those on the back. These latter were not noticed until the evening of June 30th, and he admitted they might have been produced by the settling of blood after death. The testimony of another physician supports the view that the marks probably were inflicted before death; that in his opinion deceased did not come to death by hanging or strangulation, and that the symptoms of a person who has died by hanging or strangulation were usually that the hands are clinched, the features distorted, the eyelids partially open, the eyeball protruding, and somewhat bloodshot, with pupils dilated, some froth about the mouth, the tongue protruding and somewhat swollen. When the body has dropped, the skin ordinarily is broken, but, where there is no drop, but a slow or steady pull, the skin is not likely to be cut, but is sometimes stretched so as to have the appearance of a parchment. If the body is heavy, the mark of the rope is likely to be oblique, and usually there

is a discharge of the bladder and bowels and semen from a man and a discharge from the vagina of a woman.

The knot of the rope about the neck was under the right ear, though deceased was right handed, and, as said, it was drawn below the larynx, whereas, if done by himself, the rope likely would have been tied on the other side and drawn close to the head. The condition of the body, when found, was entirely inconsistent with the theory that death resulted from hanging, and, in connection with the proof of the repose of his features and the situation of the rope so strongly supported the opinion of the physicians, that the jury might well have concluded that death was not caused thereby. Possibly this alone would not warrant a finding that some one previously had killed him, but, as any other inference than that the body had been suspended so as to simulate death by suicide to conceal homicide could not reasonably be drawn, it tends strongly to sustain that conclusion. Add to this the circumstance that he must have been carried from the house to the barn, as his stockings were not soiled as they would have been had he walked on the bare ground, and also the fact that the marks on either side of the windpipe might have been found to have been finger prints left in strangulating him, and there is enough to justify the inference that he was killed by some one, and that the body was placed in the barn to conceal the crime. True, strangulation by choking with the hands might produce the same conditions as result from death by hanging, but some of these might have been obviated subsequent to death, and the physicians were of opinion that by the administration of chloroform, because of its effect in weakening the heart's action and interfering with the respiration, the conditions mentioned would be less likely to result, and that a person under the influence of such drug would offer little or no resistance, and respiration be easily stopped. The use of chloroform was not shown, save by the alleged confession, and what has been said to explain that death from hands leaving the finger-marks at the throat

is not necessarily inconsistent with the condition of the body.

The circumstances. are peculiar, but they lead inevitably to two conclusions: (1) That life was extinct before the body was hung up in the barn; and (2) that death was not suicidal, but felonious, and therefore the *corpus delicti* was established by evidence independent of proof of defendant's alleged confession. No other inferences may reasonably be drawn from the established facts in the case, and, though the evidence of the confession might be regarded as sufficient to connect the defendant with the commission of the crime, there are other circumstances tending to show motive, and to confirm the story told by the wife of deceased, who subsequently married the defendant.

Did defendant perpetrate the crime? First, There is ground for believing that the relations of the wife of deceased with defendant had been meretricious. A brother of deceased, who was at his house in the forenoon of the day of the picnic, testified: " I went into the house. I did not see him [Rocker] when I first went in. I waited a few minutes, and Rocker came down from upstairs, and Mrs. Schroeder came down shortly afterwards." There was but one room, a bedroom, in the second story, and deceased was out in the field plowing corn. It is but fair to add that both she and Rocker deny that she was upstairs at the time, and both explain that he had come to the house for a bolt to replace one broken in the plow he had been using. Another brother testified that some time before this defendant had said to him, " I think you think there is something wrong between me and August's wife "; and, in answer to an inquiry as to what made him think so, replied, " Oh! nothing." This was entirely voluntary, as no reference had been made to their relations prior thereto. Rocker denied this; but, if the testimony of the witnesses is to be accepted, it goes a long way in explaining the motive, and it was supported by evidence that subsequent to Schroeder's death, and while working at Rock Rapids, defendant made frequent

trips to the place, leaving after dark and not returning until morning.   In the fall Mrs. Schroeder purchased a farm near Elkton, S. D., defendant attending to the business, and they lived together on this farm until spring, and then married.

Second.   The evidence tended to show that defendant had in mind the execution of some design on deceased.   A saloon keeper testified that about nine o'clock in the evening of the day of the picnic deceased and defendant entered his place, where the latter called him aside, and asked for a bottle of doped whisky, saying he would pay him well for it. Another saloon keeper related that he came to his place about an hour later, called him aside, and made a like request, and that, to an inquiry concerning the purpose of it, motioned toward deceased, saying, " It is for him."   The defendant denied making these inquiries, insisting that he asked for " deprie," an alleged German drink.   A druggist testified to selling to a person four ounces of chloroform; that it was the only sale of chloroform on that day; that, as the purchaser objected to signing the request, he did so for him, the name being Charles Berdt, but, according to the evidence, no such person was known in Doon or vicinity, and, if Mrs. Schroeder is to be believed, defendant told her that he had purchased chloroform of the druggist at the time in question, and was greatly exercised at a former hearing lest the druggist should recognize him as the purchaser.   These circumstances tend to confirm the alleged confession of Mrs. Schroeder in the fall or winter after their marriage.   She testified that he awakened her in the night by seizing her by the throat, apparently in a dream; that in the morning she asked him of what he had been dreaming, when he responded that she must keep still; that after breakfast she remarked that she now knew how August (deceased) had come to his death; that he then drew a revolver, compelling her to kneel, and told her he would tell her if she would never tell any one and would kill her if she did.   Then he stated that, " when August was outside the house sitting on a beer keg vomiting, he killed

him with chloroform and morphine, and hauled the body to the barn on a barrel cart "; that he put the body on the oats barrel, and hung it up; that he was lying in the manger when she first came out, and, when she left for deceased's brother, he went in the house and to bed; that he had bought the chloroform as stated at Hoff's drug store without signing his name. She testified, further, that the barrel cart had been left near the house the night before, and was near the barn in the morning, and that deceased had a weak stomach, and usually vomited after drinking whisky.

It will be noted that the alleged confession does not indicate how the chloroform or morphine was administered, whether by inducing him to drink or through respiration, or by force or fraud, and, owing to the volatile character of the former substance, the fact that traces of it were not found in the stomach or the scent noticed on the person is not significant, according to the experts. The administration of chloroform through respiration successfully in the open air is said, by one of the physicians, to be difficult, but we have no showing as to what method was resorted to. The confession goes no further than a full admission by defendant that he killed deceased, and a summary account of the manner without details. The theory of the State is that the power of resistance must have been exhausted by the administration of chloroform, and life ended without a struggle by choking. The condition of the body strongly confirms this conclusion. The most that can be said from the record, however, is that the jury was authorized to find that Schoeder died from having the respiration shut off by the fingers of some one, that the accused aided in this by the administration of chloroform in some manner, and therefore was rightly convicted of the offense charged in the indictment.

II. On *voir dire* two of the jurors answered that they were conscientiously opposed to the infliction of the death penalty, and upon challenge by the State on this ground were excused. Thereafter the State passed for cause, and the

counsel for defendant had not concluded his examination

**2. JURIES: challenge for cause by State: prejudice.** when the court adjourned to dinner. Upon convening again, the court directed attention to the error in so ruling (*State v. Lee,* 91 Iowa, 499), and, as defendant insisted upo·. his exceptions to the rulings, the court ordered the jury to step aside. Thereupon the names of the respective jurors were returned to the jury box, and another jury called. Manifestly there was no error in the action of the court. To hold otherwise would operate to deny the trial court the right to correct its own rulings, and eliminate error from the record. At most, it was a mere irregularity in the selection of the jury, which could not have prejudiced the defendant. No right to trial by a particular jury had attached, and all he was in a situation then to insist upon was trial by a competent and impartial jury. That he had. See 24 Cyc. 251, 255.

III.   In the course of the opening statement to the jury counsel for the State said: "At least he [defendant] woke Mrs. Schroeder up, or she was awakened by the statement,

**3. ARGUMENT: prejudicial statements of counsel.** 'August, you son of a b——, I have got you now,' or words to that effect." An objection that this was incompetent and something that could not be introduced in the case and prejudicial was overruled. The connection in which this statement appeared is not disclosed by the record. If, as assumed by appellant, it was claimed to have been made by the accused in his sleep and when unconscious it might not properly be received in evidence. *People v. Robinson,* 19 Cal. 40; *State v. Morgan,* 35 W. Va. 260 (13 S. E. 385); 12 Cyc. 423. But it is sometimes an open question whether the party is really asleep when speaking. Aside from the nature of the statement, there was nothing to apprise the court whether appellant was claimed to have been awake or asleep, and therefore it was not error to allow the statement.

IV.   The evidence disclosed that defendant was employed by deceased on his farm, and that in the afternoon of

June 29, 1900, they went to an Old Settlers' picnic at Doon

4. MURDER:
evidence of
details of
crime.

about four miles distant. J. A. Hoff operated a drug store at that place, and was allowed to testify, over objection, that late in the afternoon or in the evening of that day a man representing his name to be Charles Berdt, came into his store, and purchased four ounces of chloroform; that he objected to signing his name for it, and the witness wrote his name for him; that this was the only chloroform sold at his store on that day. The wife of deceased subsequently testified that, while living with defendant as his wife, he had declared to her that he had killed deceased with chloroform and morphine; that he had purchased the chloroform at Hoff's drug store the day of the picnic, and did not sign the application for it. Other evidence tended to show that no such person as Charles Berdt resided in that vicinity. Plainly enough the ruling was correct if evidence tending to show the administration of chloroform to deceased was admissible. Counsel for appellant has argued the point on the theory that such proof was receivable only in event the indictment charged that the killing was by means of chloroform. It alleged that defendant " did then and there, with his hands upon the neck and throat of said August Schroeder, and by means of a rope in the hands of Charles Rocker on and about the neck and throat of the said August Schroeder, and by other means, methods, and devices then and there resorted to by the said Charles Rocker to the grand jury unknown," committed the crime charged. In construing the indictment, the court instructed that a finding of death by strangulation was essential to a conviction, and at the time the evidence was introduced, counsel for the State urged that the object was not to prove death in any other manner, but to show a condition of deceased in which death could have been the more easily produced in that way. In other words, that, though death was caused by strangulation, the victim was disabled by the administration of chloroform. The evidence tended to explain

the details of the crime, not to prove that it occurred otherwise than alleged. For this purpose the evidence was admissible.

V.    It is suggested that defendant, as he weighed about forty pounds less than deceased could not have hung the body up.    Of course, he could not have done so by pulling at the other end of the rope, but, according to the confession, the body was first placed on a barrel, and there is nothing in the record to indicate that it was lifted to the joist, or that when found, it cleared the floor, or the length of the rope from the neck to the fastening on the joist.    For all that appears, though lighter than deceased, defendant might have placed the body as it was when found.

5. SAME.

VI.    The State called Dr. Cottam, and, over objection, he was permitted to testify to the appearance and condition of a person dying by hanging or strangulation.    This was not error, for it tended to rebut the inference to be drawn from the situation of the body when found that death had resulted from hanging.    So, too, was the ruling correct by which the court received evidence of the effect of chloroform on a person, as it tended directly to sustain the theory of the State that deceased was first disabled by chloroform or morphine or both, and then strangled by the hands of defendant.    Some other rulings are complained of, but they are so clearly correct as to preclude the necessity of discussion.

6. REBUTTAL EVIDENCE: theory of crime: evidence in support of.

The record is without error; and the judgment is *affirmed.*