# CHARLESTON.

## STATE v. ANDY GOLDIZEN.

Submitted March 6, 1923. Decided March 13, 1923.

CRIMINAL LAW—*Voluntary Confession Made After Statement by Officer That Confederate Had Confessed, Held Admissible.*

A confession of the accused is admissible in evidence where is appears that it was made to the prosecuting attorney and sheriff without any inducement of a worldly or temporal character in the nature of a threat, promise or benefit held out to him by them in respect to his escape from, or mitigation of, his punishment. Information from them to him that a confederate in the crime had confessed and placed the guilt on the accused, unaccompanied by any threat, induce-ment or promise of benefit by which he could escape from,

or receive diminution of, punishment from the consequences
of the crime will not render the confession inadmissible.

Andy Goldizen was convicted of murder in the second de-
gree, and he brings error.

Error to Circuit Court, Grant County.

*Affirmed.*

*L. J. Zimmerman* and *L. J. Formean,* for plaintiff in error.
*E. T. England* and *R. Dennis Steed,* for the State.

LIVELY, JUDGE:

The prisoner, Andy Goldizen, was convicted of the murder
in the second degree, of Harman Bell, and sentenced to con-
finement for 18 years. The main point of error upon which
he relies for reversal of the judgment is that the court per-
mitted his written confession to go to the jury over his
objection and exception.

Harman Bell was shot through the head while passing
through a lonely gap in the mountain, known as Hopeville
Gap, through which lies a narrow road, and through which
flows a small mountain stream. The murderers had secreted
themselves in the cliffs on the right of the road as the Gap
is approached going up the small stream, in a commanding
position from which the road could be viewed as it wound
through the gorge. The murder was committed about 4
o'clock P. M. on the....day of May, 1921. Four rifle shots
were heard, two fired almost together, and the other two a
few moments later. Bell was on horseback and had overtaken
and passed on the road a Mr. Mort Goldizen who was driv-
ing a two-horse team to his wagon accompanied by his son,
a boy about 14 years old. When Mort Goldizen arrived
at the place of the tragedy he found Bell lying on his face
on the left of the road in a crumpled position, blood scattered
over the road bed, and his hat lying 10 or 15 feet from his
head. A rifle bullet had penetrated the left lobe of the vic-
tim's brain, tearing a rugged orifice near the base of the
brain where it escaped. Death had been almost instantaneous.
The horse of the victim was afterwards found near the scene,
shot to death. Suspicion pointed to the prisoner and Walter
Hevner, who were afterwards jointly indicted. The prisoner

was tried separately. It appears that the prisoner and Hevner had evaded the draft service in the World war, and Bell had been instrumental in securing their apprehension, and they had been confined by federal authority for about seven months. Upon their release, and return to Grant county, they had made inquiry as to the whereabouts and doings of Bell, and had made serious threats upon his life because of his former activities against them. About noon on the day the murder was committed they had inquired and ascertained that Bell had gone to Petersburg and would likely return by his usual route through Hopeville Gap which was a short distance from where they were working and in the near neighborhood of where they resided. Henry Goldizen, a brother of the prisoner, was later apprehended on a charge of violating the prohibition laws, and was placed in the Keyser jail pending his trial. While there he sent for sheriff Kimble and told him of a conversation between himself and the prisoner, his brother, a short time after the tragedy, in which the latter told him that he and Walter Hevner had done the shooting in the Gap, and detailed the occurrence, stating what guns had been used, and where one of the rifles, the Remington, had been secreted. The rifle was afterwards found where hidden. The prisoner and Hevner were arrested, and the jail at Petersburg not being secure, they were taken by Sheriff Kimble to the Keyser jail. The authorities there could not accommodate but one of them and so informed the sheriff; however, they were lodged in jail and upon instructions of the sheriff placed in separate cells in different parts of the jail to prevent communication with each other. The following day the sheriff, accompanied by the prosecuting attorney, Smith, returned to Keyser, for the purpose, as they stated, of taking one of the accused to another jail, and to arrange for preliminary hearing, if the prisoners desired such hearing. That night Hevner made a written confession before Welch, a notary public. The confession of Hevner is not in evidence. On the following morning about 9 or 10 o'clock, the sheriff and prosecuting attorney went to the jail and had Goldizen brought down to the reception room where

he said he wanted to make a statement; he was then taken to Attorney Welch's office accompanied by these officers, and his statement was reduced to writing by Mr. Welch before whom the prisoner made oath thereto after it was read to, and signed by him. Welch, on his own volition, cautioned the prisoner and told him that the statement he was about to make would be used against him, and asked him if there had been any inducements held out to him or any threats made against him. The sheriff and prosecuting attorney say that no threats, promises or offers of reward or immunity were offered to Goldizen, and that his confession was freely and voluntarily made. The sheriff says that after the prisoner had been brought out of his cell to the reception room, and they had some talk about the transfer of the prisoner to another jail and his preliminary hearing, the prisoner said he supposed that ''Henry (Goldizen, his brother) had told all and he might as well make a statement.'' That he then did make his statement which was afterwards repeated to Welch and reduced to writing. The prosecuting attorney says that after talking about the preliminary hearing, the sheriff asked the prisoner if he wanted to make any statement about the matter, and after some moments, prisoner replied: ''Well, I guess 'Hen' has told all any way and I might just as well tell the truth.'' He did not remember if anything had been said about Walter Hevner having made a statement. He says that no promises or inducements were made to the prisoner, and no threats made. On the contrary, he says that Sheriff Kimble told the prisoner that they had no inducements to offer, and that if he made any statement, to tell the truth about it. The prisoner says that the sheriff on that occasion told him that Hevner had told the whole story on him, and that then the prosecuting attorney ''just as good as promised he would help me out if I would come up and confess it.'' Welch says that he asked the officers how they came to get this statement from Goldizen at that time, and ''Smith told him that they had told Goldizen that Walter Hevner had made a statement the night before putting the blame on him and he (Goldizen) said he was going to tell

the truth and then come over." On this evidence as to how and under what conditions the confession was given, the court admitted it as evidence to the jury, the witnesses again detailing to the jury the facts concerning the making of the confession. The written confession gives the full details of the murder.

By this confession the accused says he had made up his mind to "get Bell" or Bell would get him, because he had been instrumental in having the accused arrested as a "slacker"; that he and Hevner had talked the matter over a few times and he, the accused, had bought his 32 Remington high power rifle from his brother, who also had a .303 Savage rifle, both of which guns they took on the day of the shooting, first having learned that Bell had gone to Petersburg that morning. They went down to the Gap, reaching there about 2 o'clock in the afternoon, keeping to the woods. The Savage rifle was in the hands of the accused, and the Remington was held by Hevner, who took a station above the accused, in what he called a channel above the rocks. They waited there until about 4 o'clock, and several persons, whose names are given, passed through the Gap on the road. When Bell got opposite them he heard a gun crack and Bell fell from his horse immediately. At the time Bell was eating a banana, and riding a black horse with a white streak running down its forehead. The horse made a quick jump and went walking on, and after it had taken a few steps two more shots were fired at the horse. The accused did not fire his gun at all, but it went off once in his hands while he was trying to get it unchoked. Immediately after the shooting Hevner complained that he, the accused, had not done any of the shooting, when it was explained that the gun had become choked. They immediately left the rocks and went back toward home, and on the way met Branson Hevner, and his companion told Branson not to tell any one that he had seen them. Upon reaching home the accused put the guns in the stable, but the Savage gun was then at the house and the Remington hid away up against the mountain above Andy Rhorbaugh's house; that he had taken it there after he had learned that

investigators had found a shell down in the Gap and "that the gun I had was the only one that shot that kind of a shell."

The confession says that the accused told his brother Henry about the shooting but did not tell who fired the shot. It also says that the statement was read to the accused by R. A. Welch and was signed by the accused without any inducements or compulsion being used to get him to make the statement. It was duly sworn to before Welch as notary public.

After the confession had been made the prisoner was transferred from the Keyser jail to the jail at Parsons in Tucker county, and on the way he told the sheriff where the Remington rifle with the box of shells could be found, and afterwards they were found at the place which he designated.

While there may have been evidence sufficient to sustain the verdict, and a verdict of guilty might have been returned without the confession, it is clear that if the confession was not admissible in evidence the rights of the accused have been greatly prejudiced thereby. The confession with its minuteness of detail and the manner in which the shooting was done, taken together with the finding of the Remington shell at the place designated in the cliffs where the accused and his confederate had stationed themselves, and the other physical evidences of the concealment of the murderers at the place in the rocks designated in the confession, together with the motive and other corroborating facts, impel belief in the truth of the statement; at least that he was present and an active participant in the crime, and as guilty as if he had fired the fatal shot. The substance of the confession is not denied by the accused. He was put on the stand simply for the purpose of showing that the confession was obtained from him by an implied promise of leniency, when the confession was made. He is not specific as to what benefits had been promised him. His statement was that "Mr. Smith just as good as promised he would help me out if I would come up and confess to it." The confession impelled conviction, and if not properly admissible was necessarily of the most damaging character. On the admissibility of this confession the whole case turns. The other assignments of error, the giving of

instructions and the sufficiency of the evidence depend upon this major question.

It is well settled by the decisions of this state and those of Virginia that a confession may not be given in evidence if it appears that it was obtained from the accused by some inducement of a temporal or worldly character in the nature of a threat, or some promise or benefit held out to the accused by which he may expect to escape from the consequence of his crime, or mitigation of punishment, by some one in authority or by some person with the apparent sanction of those in authority. *State* v. *Morgan,* 35 W. Va. 260; *Smith's Case,* 10 Grat. 734; *Jackson* v. *Commonwealth,* 116 Va. 1015; *Early* v. *Commonwealth,* 86 Va. 921; *Shiflett's Case,* 14 Grat. 659; *Thompson's Case,* 20 Grat. 724; *Mitchell's Case,* 33 Grat. 845. Was there any threat, inducement or promise made to Goldizen which induced him to make this confession? Was the confession voluntary? We have stated the evidence of the sheriff, prosecuting attorney, the accused, the notary public before whom the confession was taken and the circumstances under which the confession was made at some length, and we are unable to see that any threat or promise was made as an inducement of the confession. The prosecuting attorney and sheriff are very positive that no such threat, promise or inducement was made. On the contrary, it appears that the sheriff, at the time, expressly told the prisoner that they had none to offer. The notary public, out of an abundance of caution and on his own volition, he having stated that he thought it was his duty to warn the accused, told him before he entered upon the statement, that it would be used against him in the trial, and the sworn confession itself says that no such threat or promise had been made. It may be true that he was informed by these officers while in the sitting room of the jail that his confederate, Hevner, had made a statement throwing the blame upon him. If so, it was a statement of fact. It clearly appears that Hevner had made such a statement the night before, and we cannot see how this fact could be construed into a threat or a promise. It is claimed by the prisoner's counsel that the confession was obtained by

deception. Was there any deception in advising the prisoner of a fact which would affect his trial? Moreover, it appears that Henry Goldizen, a brother of the accused, had informed the sheriff in a written statement of the substance of what was contained in the confession, a fact which seems to have been known to the prisoner at the time he made the statement to these officers. He said that he supposed that Henry had told all about the affair, and he might as well tell the truth also. It will be observed also that the prisoner was unable to tell what promise had been made to him by the prosecuting attorney. He said, "Mr. Smith asked me who done the shooting, and, Mr. Smith just as good as promised he would help me out if I would come up and confess to it." On cross examination he said in substance that Smith told him that if he would confess he would make it easier on him and help him out. This alleged promise was denied emphatically both by the sheriff and prosecuting attorney, and all of this evidence, together with the confession, went to the jury, for its determination as to the credibility of the witnesses. It was held in the case of *Cortez* v. *State*, 47 Tex. Crim. Rep. p. 10, that where the accused was informed that his co-defendant was laying the homicide upon him and was told that any statement he might make would be used for or against him, and thereupon the accused made a statement concerning the killing, in which he implicated himself, the confession would be received, and was permissible in evidence. There are quite a number of decisions which hold that a confession obtained by artifice does not render it illegal; and where the accused has been told that an accomplice has made a confession and implicated him and as a result thereof the prisoner makes a statement confessing the crime, it does not render such statement inadmissible. *State* v. *Jones*, 54 Mo. 478; *State* v. *Wilson*, 172 Mo. 420; *State* v. *Rush*, 95 Mo. 199; *Burley's Case*, 2 Lead. Crim. Cas. 202; *Price* v. *State*, 18 O. St. 418. In the case at bar we fail to see that artifice has been employed. In the decisions above cited the information given the accused to the effect that a co-conspirator or confederate had confessed, was not true; and yet the confession

obtained thereby was admitted to the jury.. By citing these
cases in which confessions were obtained by artifice we do not
mean to approve of that method; but they are cited simply
to show the real basis on which confessions are rejected. The
reason for the exclusion of confessions made under duress or
threats or as the result of promise or immunity from punish-
ment, is that the testimony is likely to be untrue, untrust-
worthy. Testimonial worthlessness is the underlying and fun-
damental principle on which confessions are rejected. The
theory is that confessions which are obtained by artifice, (there
being no threat or promise) are likely to be true, supposing
there is nothing in the artifice calculated to produce an untrue
confession. Mr. Wharton in his Criminal Evidence in sec-
tion 670 says that confessions obtained by trick, artifice or
deception may have been admitted by an unbroken line of
authorities during the periods of the law. We do not perceive
anything, under the circumstances of the making of this con-
fession which would impel the belief that artifice, deception or
fraud was practiced or anything which would lead us to be-
lieve that an untrue statement was induced from Goldizen.
The reason for excluding confessions fails in the case at bar.
Greenleaf lays down the proper test as follows: ''The only
proper question is, whether the inducement held out to the
prisoner was calculated to make his confession an untrue
one.'' He further says that the spirit of extreme caution
and liberality toward accused persons has resulted in many
rulings not to be defended upon principle; but the tendency
in law courts today is towards repudiating the most extreme
of these rulings of the first half of the nineteenth century,
and to approximate toward the use of the test above quoted.
Greenleaf on Evidence, Vol. 1, sec. 219. In *Baldry's Case,*
2 Denison's C. C. 430, Justice Erle says: ''According to my
judgment, in many cases where confessions have been ex-
cluded, justice and common sense have been sacrificed, not
to the shrine of mercy, but to the shrine of guilt.'' It is true
that the prisoner has stated that he would not have made
this confession if he had not been induced to do so by the
promise of being helped out of the difficulty, made by the

prosecuting attorney; but this was a question to be determined by the jury and was properly placed before them to assist them in determining what weight, if any, they should give to the confession. We do not relax the stringency of the rule governing confessions, which has prevailed for many years in this and the mother state, in holding the confession admissible evidence.

It follows from what we have said that the objections to instructions Nos. 4, 6 and 7 for the State were not erroneous. These relate to the confession and to the weight which should be given to it by the jury, if any at all. Instruction No. 4 admonishes them to consider the confession of the accused with caution, taking into consideration all the circumstances under which it was made, and to weigh it in the light of all the surrounding circumstances as disclosed by the evidence. Instruction No. 6 told the jury that if they did not believe that the confession was freely made without influence of hope or fear held out by the officers, then they were at liberty to disregard the confession. And instruction No. 7 told them that they were the sole judges of the weight and credit to be given to the confession. We note that instruction No. 8 told the jury that if they did not believe that the confession made by the defendant and read by the witness Welch in his evidence to the jury was freely and voluntarily made, then they had the right to reject the confession wholly from consideration. Instruction No. 9 is to the same effect. It is apparent from all of these instructions that the jury was fully told what credence, if any at all, they should give to the confession, and how they should weigh it.

The third and last assignment of error is that the evidence is not sufficient to sustain the verdict. As heretofore remarked, with the confession properly admitted, taken into consideration with the other evidence, we think the verdict is amply sustained. Indeed, if there had been a verdict of murder in the first degree we do not see how we could disturb it.

Perceiving no error, the judgment of the lower court will be affirmed.                              *Affirmed.*