STATE OF WEST VIRGINIA

*v.*

CHARLES GRATTON PLANTZ

(No. 12897)

Submitted February 2, 1971.      Decided April 27, 1971.

*Arthur T. Ciccarello, James B. McIntyre,* for plaintiff in error.

*Chauncey H. Browning, Jr.,* Attorney General, *George E. Lantz,* Deputy Attorney General, *Willard A. Sullivan, Cheryl A. Wheeler,* Assistant Attorneys General, for defendant in error.

HAYMOND, JUDGE:

On January 16, 1968, at a regular term of the Intermediate Court of Kanawha County, West Virginia, the

grand jury attending that court returned an indictment for murder in the statutory form against the defendant, Charles Gratton Plantz.

On March 22, 1968, the defendant moved the court to suppress all statements, admissions, conversations and declarations made by him to any officer or any member of the staff of the prosecuting attorney on the ground that they were illegally obtained and were involuntary, and to suppress all evidence obtained by any search of the person of the defendant or the premises of his grandmother on the grounds that such evidence was seized without a warrant and that the search of such premises was illegal. After hearings upon the motion in August and September, 1968, the court, by order of October 25, 1968, denied the motion and held admissible the evidence which the defendant moved the court to suppress.

Upon the trial of the indictment, the jury by its verdict rendered November 22, 1968, found the defendant guilty of murder of the first degree with recommendation of mercy. The court overruled the motion of the defendant to set aside the verdict and to grant him a new trial and by final judgment rendered December 4, 1968, sentenced the defendant to confinement in the penitentiary of this State for the rest of his natural life.

By its judgment of May 9, 1969, the Circuit Court of Kanawha County, West Virginia, refused to grant the defendant's petition for a writ of error and supersedeas to the final judgment of the Intermediate Court of Kanawha County; and to that judgment of the Circuit Court this Court granted this writ of error and supersedeas upon the application of the defendant. On February 2, 1971 the case was heard upon the record and the written briefs and the oral arguments of the attorneys in behalf of the respective parties and submitted for decision.

About 9:30 o'clock on the morning of December 28, 1967, during an investigation by the Charleston city police of the disappearance of Helen Louise Miller, a nine year old girl, her body was found in a wooded area between

the 1400 block of Red Oak Street and Beech Avenue in the City of Charleston, Kanawha County, West Virginia. Certain Mennen toilet articles were found near and beneath the left arm of the body which was nude from the waist down. An autopsy disclosed that the cause of death was three main stab wounds, one in the chest which penetrated the heart, and two in the back, and that the vagina was torn and contained male seminal fluid.

About 5:00 o'clock in the evening of the same day, Richard Belcher, a resident in the area where the body was found, informed the police that about 7:00 o'clock that morning he found on the front seat of his parked automobile a bowie knife and that a hunting knife and scabbard which Belcher kept in the glove compartment of the automobile were missing.

During the investigation of the death, officer Crouse, who was also investigating a robbery, informed the defendant's brother that he wanted to talk with the defendant about the robbery, and about 11:00 o'clock in the morning of December 29, the defendant and his brother went to police headquarters where, except for a brief absence on the part of the brother, they remained until about 7:00 o'clock that evening. While there the defendant telephoned William T. Brotherton, an attorney who had represented him in a previous matter, and informed Brotherton that he had been in the detective bureau all day under questioning and asked him what he could do and Brotherton told him that if he was not under any charge, he could "get up and walk out". Following that conversation they left police headquarters and went to the home of the defendant's grandparents in South Charleston where the defendant and his wife were staying temporarily, and where about 8:15 o'clock the same evening the defendant was arrested without a warrant by two Charleston police officers on the robbery charge, was returned to police headquarters, and was booked on that charge about 8:30 o'clock. Some time after the arrest the defendant's brother called Brotherton to tell him that the defendant had been arrested on two charges but

Brotherton told him he could not represent the defendant and said that the defendant should ask for a court appointed attorney. About 11:00 o'clock that night Chief of Police Bias telephoned Brotherton at the request of the defendant and Brotherton told Bias that the defendant should seek court appointed counsel and also told the defendant during the same conversation that he could not represent him and that he should "get the police to have the court appoint you an attorney" and that he "shouldn't say anything until you have an attorney present." At that time Brotherton said that he knew the defendant was under arrest for armed robbery and for murder.

The officers who made the arrest testified that en route to police headquarters they advised the defendant of his constitutional rights, that he did not have to say anything, that anything he might say might be used against him in a court of law, that he was entitled to an attorney to be present when questioned by any police officers and that if he did not have the money to employ an attorney the court would appoint one for him free of charge. Upon his arrival at police headquarters the defendant signed a paper which contained an explanation of his constitutional rights and when officer Crouse asked the defendant what Brotherton had advised him in the telephone conversation to do the defendant replied that Brotherton told him to tell what had happened and to be truthful about it or if he did not want to he did not have to say anything to the officers. After this had taken place the defendant was questioned by Jack Huffman, an assistant prosecuting attorney of Kanawha County, and police officers and during the questioning the defendant consulted with his wife, was supplied adequate food and drink, and was in no way mistreated. During the interrogation, the defendant admitted that he had taken a set of Mennen toilet articles and a pair of binoculars from a home near the scene of the crime; that he had pilfered the hunting knife from the glove compartment of the Belcher car and he identified the bowie knife found in the Belcher car as being the knife that he had purchased from the Cohen drug store;

and he admitted that he had used the Belcher knife to stab his victim. He told the officers that when he got to the home of his grandparents in South Charleston he discovered blood on his clothing, that he hid his shirt and trousers in a clothes hamper in the basement, and that he also hid the binoculars in the house because they had blood on them. The defendant also told the officers that while he was walking around he saw the little girl walking on the street; that he took her by the hand and walked with her and talked to her; that they walked up a hill and when they had arrived near a big tree on a vacant lot he had her lie down, asked her if she had ever had sexual relations and after she told him that she had had sexual relations with a boy she thought was her cousin, he put his finger in her vagina; that she started to cry and to scream; that he put his hand over her mouth to muffle her scream and then stabbed her with the knife; that after he did that he jumped up and started to run; that he did not remember exactly how he got to Patrick Street, but that after he got to Patrick Street he walked across the Patrick Street bridge and threw the knife and the other articles from the bridge.

Having obtained this information, the officers went to the home of the grandparents of the defendant and told the grandmother that they wanted binoculars, trousers, and a shirt which the defendant had left there. She told them they could talk to her husband about it, which they did, and the grandparents gave the officers permission to search the house and the grandfather signed a written consent to the search. No search warrant was issued or used in connection with the search.

Following the seizure of the articles, two warrants were issued, but not executed, charging the defendant with rape and murder, and at approximately 12:50 o'clock in the morning of December 30, he was booked on those charges. From about 1:13 o'clock, about twenty-five minutes after he was booked, two police officers interrogated the defendant until about 2:25 o'clock that morning and the questions and the answers were taken in shorthand by

a secretary of the police department and transcribed and incorporated in a written statement. During or about the time the statement was being prepared the defendant was permitted to use the telephone and he made a long-distance telephone call to his mother and several other telephone calls. He also consulted with his wife and the defendant was treated with kindness and respect by everyone connected with the investigation.

When the statement was presented to the defendant for signing, at approximately 4:30 o'clock that morning, he refused to sign it for the stated reason that his wife did not think he should although he told officers present that the statement was true and correct. Some time after 5:00 o'clock that morning, Huffman returned to police headquarters where he talked to the defendant and told him that he did not have to talk with him and if he did anything he said could be used against him in a court of law, and that he had the right to an attorney and the court would appoint one for him. Huffman said that the defendant told him that he did not want or need a lawyer and that he did not mind discussing the case with him but that he would not sign the statement because it was not true and that he would himself write what actually had happened. Huffman said the defendant began to write and talk and that the statement was completed and signed by the defendant about 8:30 o'clock that morning. About an hour later he was taken before a justice of the peace and placed under oath and induced or required to testify to the facts contained in the statement, after which the justice issued a warrant for the arrest of the defendant for the murder of Helen Louise Miller. The defendant was committed to jail under the warrant issued by the justice and was subsequently indicted by the grand jury of the Intermediate Court of Kanawha County for the crime of murder and was convicted of that offense. The robbery charge against him was dismissed.

With respect to the condition of the defendant during the night of December 29 and the morning of December 30 while he was undergoing questioning by the different

police officers and by Huffman, his wife, Mary Plantz, to whom he was married about a week earlier on December 23, 1967, testified that when the defendant was writing the statement which he signed he did not remember anything because he had been drinking; that he completed the signed statement after she had arrived while he was writing it because she asked him to sign it; and that he was emotionally upset, had not had any rest, and was crying all the time. She also testified that Huffman told the defendant that if he confessed it would be easier on him and that Huffman would make sure that the defendant would have psychiatric care.

On cross-examination, Huffman admitted that he heard the defendant tell his mother that the unsigned statement was not true, that he had been there all evening, that the police would not let him sleep, and that he told them what they wanted to hear.

The typewritten statement which the defendant refused to sign was incorrect as to the manner and the place he met Helen Louise Miller and the manner in which he disposed of the knife with which he stabbed her and the other articles which he had in his possession. The testimony of Sylvia Miller, the mother of the girl, was that she was in bed in her home at 12:15 o'clock on the morning of December 28, 1967, that she had left her home some time during the night, presumably through an open front window, without the knowledge of any member of her family, that her absence was not discovered until her mother looked in her bedroom the next morning and found only one of her pair of old shoes and that her daughter was missing, and that the witness then went to her neighbor next door to call for help. Officer Robert Sigmon and patrolman John T. Lacaria and Thomas Hairston, an employee of the incinerator department of the city, testified that on Saturday, December 30, 1967, they found in a box in a trash can near a house at 717 Stockton Street in the area of Horn's Alley in West Charleston the knife with which the defendant stabbed Helen Louise Miller and the other articles which the defendant, in his unsigned

statement, said he had thrown from the Patrick Street bridge after he had stabbed the girl.

The trial court, over the objection of the defendant, permitted the State to introduce in evidence the articles obtained in the search of the home of the grandparents of the defendant and other recovered articles, including the two knives, and the oral statements of the defendant and the information which he gave the interrogating officers relating to the fatal stabbing of the girl by the defendant.

As the defendant did not testify at any stage of the case there was no denial by him of any of his statements or the conditions under which they were given by or obtained from him by Huffman and the police during his detention by the police.

The principal error assigned and dealt with in the brief in behalf of the defendant is the action of the trial court in admitting statements offered by the State and the evidence obtained in the search of the home of the grandparents of the defendant for these stated reasons: (1) the arrest of the defendant and his detention were illegal and statements by him during his detention were inadmissible; (2) the defendant was not advised of his constitutional rights; (3) no lawyer was provided for the defendant; (4) the long detention and the questioning by the police before the typewritten statement was completed were coercive and rendered the statements involuntary; (5) the signed statement given to Huffman was involuntary and was based upon a promise of psychiatric help; (6) the defendant was not promptly arraigned before a magistrate upon the charges of robbery by violence or murder and rape and his detention without arraignment was illegal; (7) the warrants upon which the defendant was arrested and charged with robbery by violence and murder were illegal; (8) the search of the premises of the grandparents of the defendant without a warrant was illegal and the evidence seized was inadmissible; and (9) the action of the officers in requiring the defendant to

give testimony before the justice of the peace at a preliminary hearing was illegal.

The defendant also assigns as error the action of the trial court in refusing to permit the defendant to show the conditions surrounding the admissions of the defendant before they were submitted to the jury as evidence; in permitting the State to offer evidence tending to show an act of sexual intercourse by the defendant with Helen Louise Miller; in permitting the jury to hear and in refusing to strike and to instruct the jury to disregard testimony of the witness Opal Gandee that the defendant during three visits to her home on the night of December 27, 1967, possessed and offered to sell a pair of binoculars seized during the search of the home of his grandparents and certain other articles in the possession of the defendant when Helen Louise Miller was stabbed, and sold certain other articles to the son of the witness; in refusing to direct a verdict of not guilty under the State's theory of the felony-murder doctrine and for the reasons that the State failed to establish the corpus delicti and the proof was at variance with the allegations of the indictment; in giving certain instructions offered by the State; and in refusing to give defendant's instructions 12, 13, 14 and 17 and his instruction 18 as originally offered.

On the contrary, the State asserts (1) that the arrest of the defendant was valid and his detention after his arrest did not vitiate his confession; (2) that all the statements of the defendant used as evidence at the trial were freely and voluntarily made after full and sufficient advice and warnings and the admission of such statements was correct and proper, and (3) that consent of the defendant to the search of the home of his grandparents was unnecessary and the evidence obtained in such search was properly admitted.

Section 5, Article 4, Chapter 8, Code, 1931, in effect at the time of the death of Helen Louise Miller in December, 1967, provides, to the extent here pertinent, that "In order to arrest for violation of municipal ordinances *and as to*

*all matters arising within the corporate limits and coming within the scope of his official duties,* the powers of the sergeant or of any policeman shall extend anywhere within the county or counties in which the municipality is situated." (Emphasis supplied.) Under the quoted provision as to all matters arising within the corporate limits and coming within the scope of their official duties, the police officers who arrested the defendant about 8:15 o'clock on the evening of December 29, 1967 at the home of his grandparents which was located in South Charleston, Kanawha County, were authorized to make such arrest. The undisputed evidence is that Helen Louise Miller was fatally stabbed in a section of the City of Charleston and that homicidal act was within the scope of their official duties. From the investigation which the arresting officers had made of the charge of robbery of which the defendant was suspected and the investigation of the murder of Helen Louise Miller and the information obtained and possessed by the arresting officers which included the discovery of the knife previously purchased by the defendant and left in the automobile of Belcher before the defendant was arrested shortly after 8:00 o'clock in the evening of December 29, 1967, the arresting officers had reasonable grounds and probable cause to believe that the defendant had committed a felony and the arrest of the defendant without a warrant on the charge of robbery was a valid arrest. *The City of McMechen ex rel. Willey* v. *Fidelity and Casualty Co. of New York,* 145 W.Va. 660, 116 S.E.2d 388; *State* v. *McCauley,* 130 W.Va. 401, 43 S.E.2d 454; *State ex rel. Brown* v. *Spangler,* 120 W.Va. 72, 197 S.E. 360; 2A M.J., *Arrest,* Section 8. See also *United States* v. *Irby,* 304 F.2d 280 (4th cir.) *certiorari denied,* 371 U.S. 830, 83 S. Ct. 39, 9 L. Ed. 2d 67; *Morris* v. *Bowles,* 386 F.2d 395, (4th cir.) *certiorari denied,* 390 U.S. 1043, 88 S. Ct. 1640, 20 L. Ed. 2d 304; *United States* v. *Richmond,* 57 F. Supp. 903, (S.D.W.Va.). Probable cause to make an arrest without a warrant exists when the facts and the circumstances within the knowledge of the arresting officers are sufficient to warrant a prudent man in believing that an offense has been committed or is being committed. *Hill* v.

*California,* 401 U.S. 797, 91 S. Ct. 1106, 28 L. Ed. 2d 484; *McCray* v. *Illinois,* 386 U.S. 300, 87 S. Ct. 1056, 18 L. Ed. 2d 62; *Brinegar* v. *United States,* 338 U.S. 160, 69 S. Ct. 1302, 93 L. Ed. 1879; *Katz* v. *Peyton,* 232 F. Supp. 131 (E.D.Va.), *affirmed,* 334 F.2d 77 (4th cir.) *certiorari denied,* 379 U.S. 915, 85 S. Ct. 261, 13 L. Ed. 2d 185, *rehearing denied,* 379 U.S. 984, 85 S. Ct. 643, 13 L. Ed. 2d 577; *Houston* v. *Peyton,* 297 F. Supp. 717 (W.D.Va.).

In *The City of McMechen ex rel. Willey* v. *Fidelity and Casualty Co. of New York,* 145 W.Va. 660, 116 S.E.2d 388, this Court held in point 1 of the syllabus that "A peace officer may lawfully arrest one without a warrant if he believes, upon reasonable grounds, that the person arrested has committed a felony, though not committed in the officer's presence; and an arrest made under such circumstances is not rendered unlawful or unwarranted by the fact that it afterwards appears that the person arrested is innocent or that no felony was actually perpetrated."

In *State ex rel. Brown* v. *Spangler,* 120 W.Va. 72, 197 S.E. 360, point 3 of the syllabus states that "An officer, with authority to conserve the peace, may, without a warrant, arrest any person who he, *upon reasonable grounds,* believes has committed a felony, though it afterwards appears that no felony was actually perpetrated. This rule applies to a person charged with a felony in a sister state." As the arrest of the defendant was a lawful arrest, the detention of the defendant following his arrest was fully authorized and valid.

The action of the intermediate court in overruling the motion of the defendant to suppress statements and admissions made by him to the assistant prosecuting attorney and the police officers which amounted to a confession of his guilt was correct and proper, when it appeared that such statements and admissions were freely and voluntarily made after the defendant had been advised of his constitutional right to remain silent and that anything he said could be used against him in a court of law and that

he has the right while in custody to have an employed or court appointed attorney present when questioned and it also appeared that the defendant waived his right to the assistance of an attorney. It is well established by the decisions of this Court that it is the function of the trial court, before admitting a confession in evidence, to determine that such confession was voluntarily made. *State v. Fortner,* 150 W.Va. 571, 148 S.E.2d 669; *State v. Vance,* 146 W.Va. 925, 124 S.E.2d 252; *State v. Bruner,* 143 W.Va. 755, 105 S.E.2d 140, *certiorari denied,* 358 U.S. 937, 79 S. Ct. 328, 3 L. Ed. 2d 309, *rehearing denied,* 359 U.S. 921, 79 S. Ct. 600, 3 L. Ed. 2d 584; *State v. Brady,* 104 W.Va. 523, 140 S.E. 546. See also *Jackson v. Denno,* 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908, 1 A.L.R.3d 1205; *Boles v. Stevenson,* 379 U.S. 43, 85 S. Ct. 174, 13 L. Ed. 2d 109.

That the confession of the defendant was voluntary was shown to the satisfaction of the court and by a preponderance of the evidence and the action of the court in permitting it to be considered by the jury upon the trial of the case was correct and proper. *State v. Vance,* 146 W.Va. 925, 124 S.E.2d 252; *State v. Bruner,* 143 W.Va. 755, 105 S.E.2d 140, *certiorari denied,* 358 U.S. 937, 79 S. Ct. 328, 3 L. Ed. 2d 309, *rehearing denied,* 359 U.S. 921, 79 S. Ct. 600, 3 L. Ed. 2d 584; *State v. Mayle,* 108 W.Va. 681, 152 S.E. 633; *State v. Brady,* 104 W.Va. 523, 140 S.E. 546; *State v. Richards,* 101 W.Va. 136, 132 S.E. 375; *State v. Zaccario,* 100 W.Va. 36, 129 S.E. 763; *State v. Goldizen,* 93 W.Va. 328, 116 S.E. 687; *State v. Morgan,* 35 W.Va. 260, 13 S.E. 385.

After the trial court determines that a confession is admissible in evidence it becomes the function of the jury to consider the weight and the credibility of the confession. *State v. Brady,* 104 W.Va. 523, 140 S.E. 546; *State v. Richards,* 101 W.Va. 136, 132 S.E. 375.

Contrary to the contention of the defendant, the undisputed evidence was that while in custody but before he was subjected to questioning by the assistant prosecuting attorney and the police officers he was advised that he had the right to remain silent, that anything he said could be

used against him in a court of law, that he had the right to the presence of an attorney, and that if he could not afford an attorney one would be appointed for him if he so desired. He was also afforded an opportunity to exercise such rights during the time that he was being interrogated. On two occasions he talked to an attorney who had previously represented him and was advised by the attorney that he had the right to remain silent and that he should not say anything until an attorney was present. It also clearly appears that the defendant, during the period of his detention of approximately thirteen hours before his arraignment, was treated fairly and with respect and consideration and was given food and drink and permitted to see and converse with his wife privately which he did more than once for several minutes, and to see his mother and stepfather who visited him, and was also afforded the opportunity to talk to his brother which he declined to do. He was permitted to use the telephone which he did in two conversations with his former attorney who advised him that he could not represent him and to talk to his mother before she visited him, and he also made other local telephone calls. The undisputed evidence also shows that he told the police officers and the assistant prosecuting attorney that he did not want an attorney and did not request that they provide an attorney or obtain a court appointed attorney for him. It is also clear that his statements were not obtained or induced by fear or favor or by any promise of immunity or leniency or favor or benefit or promise of treatment by a doctor or a psychiatrist. The defendant refused to sign the statement typed by the secretary because he said it was not true or because his wife and his mother advised him not to sign it although officer Crouse heard him say that the statement was true and correct. He did, however, voluntarily write a second or later statement while conversing with the assistant prosecuting attorney. After he had written about one-third of that statement he paused in its preparation for several minutes and later, after consulting with his wife, finished the statement and signed it. The defendant also signed

two statements that he had been advised of his constitutional rights.

In the opinion in the landmark case of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3d 974, the Supreme Court of the United States, in prescribing safeguards for the protection of a person who is taken into custody or deprived of his freedom by the authorities and is subjected to questioning, after declaring that any statement given freely and voluntarily without any compelling influences, is of course, admissible in evidence, used this language in the majority opinion: "To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."

The undisputed evidence shows that the requisite procedural safeguards stated in detail in the majority opinion in the *Miranda* case, and quoted above, were fully complied with and satisfied while the defendant was questioned

during his detention. His statements were made freely and voluntarily and were admissible against him, and the action of the trial court in admitting them in evidence was correct and proper. The mere fact that a confession of guilt was made while the accused was in the custody of the police does not render it inadmissible. *McNabb* v. *United States,* 318 U.S. 332, 63 S. Ct. 608, 87 L. Ed. 819. "To exclude a confession, it must not only be made under inducements of favor or fear, but such inducement must come from one in authority." Point 4, syllabus, *State* v. *Morgan,* 35 W.Va. 260, 13 S.E. 385.

A statement freely and voluntarily made by an accused while in custody or deprived of his freedom by the authorities and subjected to questioning is admissible in evidence against him if it clearly appears that such statement was freely and voluntarily made after the accused had been advised of his constitutional right to remain silent and that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney and if he can not afford an attorney one will be appointed for him, and that, after he has been so advised, he knowingly and intelligently waived such rights.

The defendant cites and relies on *McNabb* v. *United States,* 318 U.S. 332, 63 S. Ct. 608, 87 L. Ed. 819 and *Mallory* v. *United States,* 354 U.S. 449, 77 S. Ct. 1356, 1 L. Ed. 2d 1479 to support his contention that the statements of the defendant during his lengthy detention were not freely and voluntarily made; that he was not advised of his constitutional rights and that the failure to take the defendant promptly before a magistrate or justice of the peace rendered his statements inadmissible.

Those cases, because of the different facts and conditions surrounding the detention of the defendants, are clearly distinguishable from the case at bar. In the *McNabb* case the Supreme Court set aside convictions in a federal court based upon evidence of incriminating statements obtained by the unremitting questioning by numerous officers over a period of two days of the defendants,

who were ignorant and inexperienced young men, without the aid of friends and the benefit of counsel while they were being held in custody by the arresting officers and were not brought before a United States Commissioner or a judicial officer, even though they were advised by one of the officers that they did not have to make a statement, that they need not fear force, that any statement made by them would be used against them, and that they need not answer any questions asked unless they so desired. It is clear that in that case the defendants were mistreated during their lengthy detention and they were never taken before a United States Commissioner or a judicial officer. In the *Mallory* case, the defendant, a nineteen year old lad of limited intelligence, was arrested by the police on suspicion of rape, and even though the police had ample evidence from other sources than the defendant for regarding him as a chief suspect, they first questioned him for approximately one-half hour and then asked him to submit to a lie-detector test and to another such test after four hours of further detention. He was not advised of his right to counsel or to a preliminary examination before a magistrate and was not warned that he might keep silent and that any statement made by him might be used against him. The judgment of conviction imposing a death sentence was reversed by the Supreme Court of the United States. The conditions surrounding the detention of the defendants in the *McNabb* and *Mallory* cases were entirely different from those surrounding the defendant during his detention and, in consequence, the decisions in those cases are not controlling in the decision of the case at bar.

There is no merit in the contention of the defendant that the search of the premises of his grandparents without a warrant was illegal and the evidence seized was inadmissible. The uncontradicted evidence is that the defendant and his wife resided in a rural area on Elk River and did not reside but were staying temporarily at the home of the grandparents which was owned and controlled by them, and there is no showing that the defendant or his wife

was assigned to or occupied any particular part of the residence of the grandparents. The well-established general rule is that the voluntary consent of a person who owns or controls premises to a search of such premises is sufficient to authorize such search without a search warrant, and that a search of such premises, without a warrant, when consented to, does not violate the constitutional prohibition against unreasonable searches and seizures. *Tolbert* v. *State*, 224 Ga. 291, 161 S.E.2d 279, *certiorari denied*, 393 U.S. 1005, 89 S. Ct. 493, 21 L. Ed. 2d 468; *Burge* v. *United States*, 342 F.2d 408, (9th cir.) *certiorari denied*, 382 U.S. 829, 86 S. Ct. 63, 15 L. Ed. 2d 72; *Rees* v. *Peyton*, 341 F.2d 859, (4th cir.); *Fredricksen* v. *United States*, 266 F.2d 463, (D.C.cir.); *Woodard* v. *United States*, 254 F.2d 312, (D.C.cir.), *certiorari denied*, 357 U.S. 930, 78 S. Ct. 1375, 2 L. Ed.2d 1372; *People* v. *Galle*, 153 Cal. App. 2d 88, 314 P.2d 58; *Combs* v. *Commonwealth*, (Ky.) 341 S.W.2d 774; *Morris* v. *Commonwealth*, 306 Ky. 349, 208 S.W.2d 58; *Gray* v. *Commonwealth*, 198 Ky. 610, 249 S.W. 769; *Commonwealth* v. *Tucker*, 189 Mass. 457, 76 N.E. 127, 7 L.R.A., N.S., 1056; 79 C.J.S., *Searches and Seizures*, Section 62. In the *Tolbert* case, the defendant, a minor, was furnished a home rent free by his father. In the absence of the defendant, his father consented to a search by the sheriff, who had a void warrant, of an automobile of the defendant which was parked in the yard of the home of his father when searched. The search so made disclosed incriminating evidence of the identity of the defendant who was charged with the crime of rape. The court held that the voluntary consent of the defendant's father to the search of the automobile parked on the premises owned by the father was sufficient to authorize the search.

In *Rees* v. *Peyton*, 341 F.2d 859, (4th cir.), the father of the defendant, who was in custody on a charge of unlawful flight to avoid prosecution for a murder and who occasionally slept at the home of his father, signed a written consent to a search of the premises by investigating officers. The search was made without a warrant and disclosed

the presence of a pistol, the murder weapon, which was vital to the conviction of the defendant. The court held that where a house occupied by his parents was not the home of the defendant who was merely an occasional visitor with no particular space assigned to him for any purpose, his concurrence in the search of the home was unnecessary and the consent of his parents to the search rendered a search warrant unnecessary. In the opinion the court said: "Both the State and the Federal court have found that consent was understandingly and voluntarily accorded. Any question of a search warrant was thus waived, as is permissible. * * *. The elder Reeses were in exclusive possession of the house, with every right to authorize even its rummage. The testimony showed the house was not the home of the appellant, that he was merely an occasional visitor there, with no particular space assigned him for any purpose. Consequently, his concurrence in the search was unnecessary. * * *."

In *Fredricksen* v. *United States,* 266 F.2d 463, (D.C.cir.), the court held that in a robbery prosecution, a pistol found under the cushion of a sofa in the living room of a person in whose home the defendant was staying at the time, was properly admitted in evidence, where such person gave written permission for a search of the room. In the opinion by Circuit Judge Burger, now Chief Justice Burger, the court said: "The admission of the pistol found in the sofa where appellant slept was not error. The gun was found under the cushion of a sofa in the living room of one James R. McCutchan in whose home appellant was staying at the time. McCutchan gave written permission for a search of his living room by police. See Woodard v. United States, 1958, 102 U.S.App. D.C. 393, 254 F.2d 312."

The facts in the case at bar distinguish it from *Bumper* v. *North Carolina,* 391 U.S. 543, 88 S. Ct. 1788, 20 L. Ed. 2d 797 and *Jones* v. *United States,* 362, U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697, 78 A.L.R.2d 233, cited and relied upon by the defendant to establish the invalidity of the search of the premises of his grandparents. In the *Bumper* case

the defendant lived with his grandmother in a house located in a rural area. Two days after the alleged offense, four law enforcement officers, including the sheriff, two of his deputies and a state investigator, went to the house and one of them told the grandmother who met the officers at the front door, that he had a search warrant to search the house. The grandmother told him to go ahead and opened the door. In the kitchen the officers found a rifle which was later introduced in evidence at the trial of the defendant after a denial of a motion to suppress. In the opinion the court said that when a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search and that a search conducted in reliance upon a warrant can not be later justified on the basis of consent if it turns out that the warrant is invalid. The court held that the grandmother did not consent to the search and that it was constitutional error to admit the rifle in evidence against the petitioner. In the *Jones* case involving a search for narcotics of an apartment in which the defendant was a guest of the owner under a search warrant issued without a showing of probable cause and not executed in the manner provided by law, the court, though indicating that the warrant was not valid because it was issued without probable cause, remanded the case to the trial court for consideration of the question and reversed the judgment which denied the defendant standing to raise that issue.

As already indicated the articles seized in the search of the premises of the grandparents of the defendant, after their consent to such search without a warrant, consisted of the binoculars which the defendant had hidden in a small room of the home and clothing which he wore at the time the girl was stabbed and which the defendant had hidden in a hamper in the basement of the home. These articles were properly admitted in evidence by the trial court.

Though the defendant was held in custody from approximately 8:30 o'clock in the evening until approximately 9:30 o'clock the following morning, a period of about thirteen hours, before he was taken before a justice of the peace and given a preliminary hearing and was subjected to prolonged questioning with respect to the charge of murder, with some interruptions, from approximately 12:50 o'clock until 4:30 o'clock in the morning, during which time he gave the information for the statement typed by the secretary, and again from approximately 5:00 o'clock until he was taken before the justice at approximately 9:30 o'clock that morning, the defendant, while being so questioned, was not mistreated or threatened or coerced in any manner and was not subjected to any unusual exhausting measures except to be kept awake and, when the questioning was discontinued at intervals, he was afforded food and drink and permitted to be with and consult his wife. In the foregoing circumstances the detention, although lengthy, did not prejudice any right of the defendant or render his statements inadmissible, and inasmuch as a city magistrate or a justice of the peace was not readily available during his detention throughout the night, the failure of the police officers and the assistant prosecuting attorney to take the defendant before the justice until about 9:30 o'clock that morning was not violative of the provision of Section 5, Article 1, Chapter 62, Code, 1931, as amended, which requires an arresting officer to take an arrested person without unnecessary delay before a justice in the county in which the arrest is made.

The action of the assistant prosecuting attorney in inducing or requiring the defendant to testify under oath at the preliminary hearing to statements made by him during his detention was neither necessary nor proper. The statements made by the defendant at the preliminary hearing were not offered or introduced in evidence at the trial and for that reason could not adversely effect or impair the validity of the final judgment of conviction of the defendant or constitute reversible error. The

statements upon the preliminary hearing were made upon a legal examination and under Section 3, Article 2, Chapter 57, Code, 1931, as amended, even if offered, could not have been admitted in evidence against the defendant upon the trial if objected to by him. *State* v. *Shade,* 119 W.Va. 600, 195 S.E. 338; *State* v. *Price,* 113 W.Va. 326, 167 S.E. 862; *State* v. *Stroud,* 107 W.Va. 591, 149 S.E. 674; *State* v. *May,* 62 W.Va. 129, 57 S.E. 366.

The defendant bases his defense primarily upon the contentions that the statements given by the defendant to the interrogating officers and the evidence seized in the search of the home of the grandparents of the defendant were incompetent and not admissible in evidence. The defendant does not challenge the sufficiency of the evidence to prove him guilty beyond all reasonable doubt of the offense for which he was indicted; and the evidence of the torn portion of the vagina of his female victim and of the presence of male seminal fluid in her vagina is sufficient to support the charge that the defendant committed the crime of murder during the commission of rape or an attempt to commit rape.

Under an indictment for murder in the form prescribed by statute, Section 3, Article 9, Chapter 62, Code, 1931, the State may prove any manner of killing or different manners of killing. *State* v. *Morgan,* 35 W.Va. 260, 13 S.E. 385. Section 1, Article 2, Chapter 61, Code, 1931, provides that in an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, wilfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased. In *State* v. *Schnelle,* 24 W.Va. 767, after stating the difference between the cause and character of the accusation and the mode by or the manner in which the deceased was killed, this Court held in point 3 of the syllabus that the "Constitution does not require, that the accused shall be informed of the 'manner, in

which or the means, by which the death of deceased was caused.'" Under the allegations of the indictment for murder in the form prescribed by statute it was proper for the State to prove that the murder of Helen Louise Miller was perpetrated by the defendant while engaged in the commission of rape or an attempt to commit rape. See *State* v. *Lewis,* 133 W.Va. 584, 57 S.E.2d 513. In that case this Court held in point 2 of the syllabus that "Proof that the defendant committed a criminal abortion upon a woman and that she died as the result of the abortion is admissible under an indictment for murder which charges that the defendant did feloniously, wilfully, maliciously, deliberately, and unlawfully slay, kill and murder such woman but which does not state the elements of the statutory crime of abortion or that the defendant committed it or that the death of the woman was caused by the abortion."

Careful consideration of the numerous other errors assigned by the defendant, including the action of the trial court in refusing to direct a verdict for the defendant and in giving and refusing instructions offered by the respective parties, reveals no reversible error and for that reason further discussion of any such alleged errors is unnecessary.

The judgment of the intermediate court and the judgment of the circuit court are affirmed.

*Affirmed.*